Appellant ready to proceed May it please the Court, my name is Jared Marks, I represent the Appellant Sprint. I'd like to make two points this morning. One, that federal law precludes CenturyLink's tariffs from applying to the calls here because the calls are information services under the Telecommunications Act. And two, that the FCC has conclusively ruled that failure to pay a tariffed access charge doesn't violate Section 201 of the Communications Act. So on the first point, there's sort of a lot of minutiae here. I think it's helpful to understand why it matters that these calls are information services. I think it's helpful to look at the chronology of why it has mattered in the past to understand why it matters now. So in 1983, AT&T still controlled all of the local phone lines in the United States. Personal computers were sort of just barely beginning to affect consumers. At that point, the FCC made a determination. The FCC said when a company offers a service that uses a computer to process data, and that service also requires that company to hook into the local phone lines, at that point AT&T's phone lines, that service would be exempt from paying the ordinary permanent tariff access charge. The FCC says, gives a name to this kind of service. It calls it an enhanced service. And the FCC gives a name to this rule and it calls it the Enhanced Services Provider Exemption. And it just says if you have an enhanced service, you don't pay this ordinary permanent tariff access charge. So move forward in time, the FCC reaffirms the rule in 1991 and we get to 1996. And that's when Congress passes the 1996 Telecommunications Act. And that statute is important for a couple of reasons. The first thing that it does is it takes this concept of an enhanced service provider, gives it a new name, calls it now an information service, an enhanced service becomes an information service, and that concept goes into the statutory text of the 1996 Act. And then, in Section 251G of the 1996 Act, Congress says all of the compensation regimes for paying to hook into those local phone lines, those are all frozen in place. And they're frozen in place until the FCC comes along and comes up with another regime. So Section 251G preserves this rule, the Enhanced Services Provider Exemption, which says that enhanced services, now called information services, are exempt from the ordinary access charges that companies pay to hook into local phone lines. So that's sort of the state of the law. Then VoIP calling comes along. So as the Court knows, this case involves VoIP calling. VoIP calling is essentially making a phone call that begins on the Internet. Your phone is essentially connected to the Internet protocol and then a computer transforms that data into TDM format, which is the format used to send calls on the ordinary phone network. So a VoIP call uses a computer to process data just like sort of the old enhanced services, right? But the FCC declines to say whether VoIP calling is an information service. What's the basis for why the FCC, if you have any record of support for that, why the FCC declined to determine whether VoIP is an information service or a telecommunication service? The FCC has never said why it didn't do that. So as a formal matter, we don't know. I mean, in 2011, the FCC gets around to doing what Congress told it to do in 1996. It comes up with a new regime sort of for all of this stuff. And at that point, the FCC makes a prospective determination about how companies are going to pay each other for this kind of stuff. But it says, again, it doesn't say why, but it says we're not making a retrospective determination. This is probably eight times in this order, in this 2011 Connect America Fund order. So what's the FCC doing? Well, I think what the FCC is doing is it's saying, look, we've done our job. We've resolved the money issues going forward. And we don't want to have anything to do with the money issues going backwards. It's politically fraught. We're a political organization. We're going to throw it to the courts. And the courts have the statute. And they can sort of do what they will to determine — Is there any record support for what you're telling us, or is this just your estimate or your speculation as to why they didn't make that decision? Yeah. No, no, Judge Roxdale. It's really — it's my reading between the lines of what's going on. But certainly the FCC didn't say that. Is there any reason or reasonable basis, such as cost, et cetera, for why an information service would be charged less than a telecommunications service? Absolutely. What is that? So to go back to 1983, right, the reason the FCC says this in 1983 is because enhanced services are new. They have to do with computers. They're supposed to be competitive. And so the FCC says, look, the regime, the old regime, this tariffed access regime where you pay to hook into these local networks, it's not a great regime. You pay way, way more than the actual economic value of what the local phone company is offering you. And that's for historical reasons that have to do with the AT&T monopoly and universal service of phones and things like that. But the FCC says, look, we don't want these new technologies to be subject to this old common carrier regime, this regime that had to do with sort of very heavy-handed regulation of what companies paid to hook into the local phone line. So in the 96 Act, and I apologize for blanking on the section, but there's language in the 96 Act that just says, look, the Internet is great. We want it to be very lightly regulated. So far, it's been working great. You know, paraphrasing, obviously. It's been working great. We want it to be lightly regulated. So when we get to the VoIP calls, what are the VoIP calls like? Well, they're like these things that are competitive and new and use the Internet and use computers to provide a service. And so it makes a lot of sense for the FCC. When they're delivered by Sprint to CenturyTel, Sprint has converted them to TDM, right? Right. So it's no longer VoIP. It's TDM. Like any other telephone call coming in. Yeah. So what CenturyTel is doing is the same. It's the same as what it was doing for everybody else. But the background question is, so there are two background questions. One is, what does the statute say about this? And what does the FCC say about that? And that's what's really controlling and, you know, that I can kind of talk about some more. But your question is a policy question, right? So the question isn't, is Sprint sort of buying something from CenturyLink's store and not paying for it? Because that's not what's going on here. The question is, should this new service that Sprint is offering be subject to an old, inefficient, not very good system of paying for stuff? So, you know, the FCC in 2004 set out to figure out what's the economic value of the service that a company like CenturyLink provides, that a local phone company provides when it completes a call, right? It came up with about seven hundredths of a penny per minute per call. CenturyLink's tariffs here, some of CenturyLink's tariffs here, they're not twice that. They're not three times that. They're not ten times that or twenty times that. They are literally 160 times higher than the economic value. I mean, I know this is policy talk. You've got to get back to what will decide this case. Absolutely. What does the statute say? And doesn't the FCC, we give them Chevron deference. So they've looked at this carve-out provision, 251G, and they're in a transitional moment. They want to foster informational services, but they also, at least until 2020, are going to protect the local administrators. So what they basically said, and I think you said it at the outset, is, well, let's freeze time in 96. We're going to preserve that arrangement. And in 96, as you described, VoIP didn't even exist. So Sprint's same calls that end up TDM to CenturyLink were then telecommunications. They weren't informational services. So if we just follow the literal language of the statute, and especially if we give deference to Chevron, I mean, Chevron deference, why isn't the FCC right to say, well, Sprint, you were an inter-exchange carrier then? So I just want to make sure I understand your question. So what you're saying is VoIP calling before 1996 was a telecommunications service because No, I'm just saying, could you address why we wouldn't give Chevron deference to the FCC's comprehensive order that's saying this is a transitional rule, the carve-out's protecting it, and therefore, we're going to look at what Sprint, in fact, was paying, what they were doing in 96. The identical calls were telecommunications. They weren't morphed informational services. Yes. So I think the key part of — so the Court ought to give Chevron deference to the FCC here, and I think the key issue is what exactly did the FCC say? The key part here is in paragraph 957 of the Connect America Fund Order. The FCC does a double, a sort of two-track analysis, because remember, it sort of refuses to say are these information services or telecommunications services. And it says, to the extent that VoIP calls constitute information services, they were subject to the — information services are subject to the ESP exemption, the rule that says you don't pay these tariffed access charges, right? Yeah. I just — the language that they seem to rely on that I'm reading is the FCC states the Commission has already found that telecommunications transmitted in IP were subject to the access charge regime, and the same would be true to the extent that telecommunications services originated or terminated in IP. Right. So there are two issues there. One is terminology. What does access charge mean? I think of that as just the tariffs that were imposed. Right. So the FCC is actually cutting it more finely. So the FCC plain — very plainly says the ESP exemption is a kind of access charge, right? It's just not the per-minute tariffed access charge that CenturyLink wants to apply here, right? So it's saying all of this stuff was subject to access charges, information services, telecommunications services. But information services were subject to a kind of access charge called the ESP exemption, this thing that said, no, you don't pay these per-minute tariffed access charges. Right. Right. So what do we do with these calls? If these calls are information services, the FCC has given us a roadmap that says information services were subject to the ESP exemption, not the tariff thing. So then the question is just what are the calls? Right. And that's what the two-day trial was mostly about. So to some extent, right, but the analysis is actually pretty straightforward in the statute. There are two options, telecommunications services, traditional calls, or information services, right? Telecommunications in the statute are defined by sending data without the changing form. That's the language in the statute. Information services in the statute are defined as sending information with, among other things, a change in the format of the information. That's what we have here. We send the data. But if it were that binary and mutually exclusive, how would that square with the FCC's IP in the middle decision? Yeah. Yeah. Because they are, it did transform, and yet it ends up TDM and they're... Right. What the FCC says in IP in the middle is that what it cares about is net protocol conversion. So it cares about what does it look like to the person who, to the consumer, right? The consumer is blinded to what AT&T does to send its stuff in the middle. The consumer just thinks it's an old-fashioned phone call, old-fashioned phone call all the way. And the FCC specifically says that's different than if it starts in one format, changes to another format, and delivered in the old-fashioned. There is some case, though, with your time running out, what's your best case to support your, that Chevron deference doesn't allow the FCC to come to the conclusion it did? So my, I think the FCC actually, so I guess I'm not sure I'm following. What's your best case to establish that these are enhanced service, information services? Right. I guess the clarification I want to make is the FCC never said that they're not. But just give me your best case or you're never going to get to your second issue. Yeah. Yeah. The Southwest Bell and the Paytech courts both analyzed this issue. And there's a Verizon court, the three district courts that have analyzed the issue have said this kind of calls in information services. But the FCC explicitly disavowed them. Paytech's the most recent, right? That's the D.C. District Court? Right. And I don't want to get too... Well, in that case, the court made this broad comparison to Brand X, that a chassis and an engine are separate. You just sell cars. But here it seems that when it gets to Century, it's been disaggregated again. It's back to the chassis. It's back to the TDM format. So the FCC doesn't actually disavow Paytech or Southwest Bell for what we care about. What those cases said, they said two things. They said, these calls of information services, therefore another section of the statute 251B applies. FCC says, no, 251B doesn't apply. 251G applies. Look at the ESP exemption. But it doesn't say anything about the first thing, these calls of information services, because the FCC doesn't talk about whether they're information services. I'm happy to address questions on the second issue. We're going to give you an additional five minutes. Okay. Thank you. Thank you, Your Honor. I'm grateful, because I have interest in the second issue. Okay. Once you get to that. About addressing whether or not you're waiving now the preemption argument you made in district court about the Missouri, primarily the Missouri statute, about interstate calls. You want me to address that? I just asked you to. I'm sorry. So if the court wants to rule for us on that, that's great. But it's not an argument we've made here. And I want to clarify, that argument is an argument. It's not an argument about whether tariffs apply at all. Our primary argument, and the argument that we've always made, is that no tariffs apply, because federal law, which is superior to state law, says they don't. But you're not making, the district court made an opposite conclusion on preemption. And you just answered Judge Barksdale, you aren't contesting that? Right. The district court said tariffs apply. I deny your primary argument. And also your other argument, hey, all these tariffs ought to be interstate. Yes. We're not, we didn't make that argument on appeal. Okay. On the 201 issue, so the FCC, CenturyLink asserts that Sprint's failure to pay tariffed excess charges violates section 201 of the Communications Act. But the FCC, which again the court gives several indeference to, specifically said a failure to pay a tariffed excess charge doesn't violate section 201 without any complication. Was the case upholding the sort of clawback procedure that Sprint utilized that held that that was not violative of section 201? What the FCC has said is something broader than that. So it's never talked about that issue. Can you cite us a case? I wasn't asking for an administrative ruling. No, no, Your Honor. But the Supreme Court has said that the FCC definitively and authoritatively interprets section 201. That's the Global Crossing case. So it's an ambiguous statute. Courts always look to the FCC to determine what violates section 201. And here, the FCC and All-American Telephone took the decisions that CenturyLink relies on, specifically that's the MCI case and the Business Wants case, specifically distinguished both of them, said neither of them stand for the proposition that self-help or failure to pay a tariffed excess charge, those decisions don't stand for the proposition that that violates section 201. And instead, the FCC reaffirmed what it's always said, a failure to pay a tariffed excess charge for any reason, a good reason, a bad reason, with a — Your position is failure to pay can never be a 201 violation? Our position is the FCC has said that it isn't. The FCC could change its mind. Let's say you refused to pay beyond what you claimed you were owed. That still couldn't be a 201. I'm sorry. Say that again. Let's say you refused to pay even beyond what you claim — the offset you assert. Yes. That would still not be a 201 violation? Exactly. And the FCC has been really clear about this for a long time and for an actual reason, two reasons. If that's the case, why do we have a section in the statute where you're supposed to file a grievance, section 201, 208? Well, section — so that's exactly — that's exactly the point. The FCC has said, if someone isn't paying you on your tariff, we do not want to hear a grievance. We do not want a section 208 complaint. That would fill up our docket. So if someone is not paying you on your tariff, you can file a lawsuit for breach of the tariff, but you can't file a complaint with us for breach of the act, because we don't want to hear it. Section 208 gives the FCC the — gives parties the right to go complain to the FCC, and the FCC says, listen, nonpayment for any reason — I don't care who you are or what you're doing — doesn't violate the statute and the case — You're out of time. Thanks, Your Honor. Thank you very much. May it please the Court. I'm starting with this 201 while we're on the subject. Is there any situation akin to the one we've got at hand, where the FCC or a court has said that you can pay a tariff for three or four years and then decide you shouldn't be paying that tariff and start this clawback situation? There is no case that — decided by either the FCC or a court holding that it is not Your question, Judge Barksdale? Yes. And — What about a case that says it is? That's a little more complicated, and I would respectfully disagree with opposing counsel's characterization of what the Supreme Court held in Global Crossing, because in Global Crossing, the Supreme Court did not say that something is unjust and unreasonable only if the FCC says it's unjust and unreasonable. What the Supreme Court said is that something is actionable if it is either unjust or unreasonable within the meaning of the statute, or if the FCC has declared it to be unjust and unreasonable. Let me ask you more specifically then. If you were writing this decision for you, but so as to make sure it contained a limiting principle that just failure-to-pay cases won't now all be 201, what is the limiting? Is it the length of time, or is it the even — how would you limit the principle to protect failure-to-pay as not within 201? There are two ways of limiting it, Your Honor. One is that we're not simply talking about a failure-to-pay tariffed access charges. In fact, CenturyLink made clear, and the District Court made clear, that the Section 201B claim was not based on failure-to-pay tariffed access charges. In particular, starting in the summer of 2009, when Sprint began disputing its obligation to pay the tariffed rates, and then withheld the difference between the tariffed rates and .0007 per minute, that was not the basis for the 201B claim, nor was it the basis for the award of attorney's fees. The basis was the fact that Sprint went back and came up with an amount that it — by which it claimed it had overpaid, and then clawed back that that it did not dispute invoices that were clearly for TDM traffic. And that is something that was not a tariff violation. It was an unjust and unreasonable practice. And it was unjust — Okay. So just because the industry — and you saw the amicus brief — is very concerned about this second issue, you would say failure-to-pay cannot be a 201 violation unless the offsets include amounts that are undisputed? That's the critical add-on? That's part of it. Part of it. What's the second part? There are actually two of them. Okay. One is that it's retroactive. And here there was a retroactive clawback. That's different than refusing to pay a tariff amount going forward. And if 201B allowed a cause of action for that, then there would be a conflict with All-American. But that's not what we're talking about here. The second difference is that the amount that Sprint withheld was based on an unreasonable estimate. Sprint never calculated how much of this traffic from 2007 until July of 2009 actually originated in VOIP. Sprint could have calculated that, but it didn't. Instead it came up with a heads-we-win, tails-you-lose kind of estimate where it looked at the month of February 2009 and assumed that that month was reflective of the volume for a two-year period, even though the record was clear that during that time Sprint's volume of VOIP calls had increased dramatically, 32 percent from 2007 to 2008, and then by another 15 percent from 2008 to 2009. So the three, again, you can see how important this is to me. Failure to pay becomes a 201 violation when it is retroactive with no explicit described amount and it extends to amounts that are not disputed to be owed. Those are the three, or is there another? Well, and the third was that the amount was based on not the actual volume of traffic disputed, but simply an unreasonable estimate. So it was really those three. And is there, you've got any case sort of inching in that direction, 201 case law, or just? Well, certainly there are cases decided by the FCC. Right. What's the best one? That self-help is not an exception. Self-help generally. Self-help generally. The only way of reconciling those cases with All-American is that All-American involved prospective failure to pay. So I can't cite a case that is squarely on point. I would also respectfully disagree, Your Honor, Judge Higginson, with the premise of your question that this is an industry concern. It may be Verizon's concern. Verizon has come forward with an amicus brief. But even though Verizon says that this is a standard industry practice, it doesn't provide any evidence whatsoever that that's true. What they're saying, everyone acknowledges this is a transitional period. The FCC is trying to apply a balance, maybe slightly, in my mind, artificial, mutually exclusive information service versus telecommunication. So in good faith, Sprint and Horizon and your client, they're all in a flux, and the FCC may not be giving the best direction. So on this second issue, they're saying, listen, we need to be able to debate points of law and interpretations of law without risking a 201. That's what they're saying. And that seems to me an important concern. Except, Your Honor, that that concern couldn't possibly occur in the real world, because regardless of what the FCC did or didn't do, retrospectively, retroactively, going forward at the end of 2011, it made clear what the rules would be starting in January 2012. So at this point, nobody could legitimately claim to be confused as to what the compensation rules are. And at this point, it's also way beyond any statute of limitations where somebody could dispute a pre-2012 invoice. So we're not looking at introducing any uncertainty. To the contrary, what Sprint is asking this Court to do is to basically say that CenturyLink has a right, but no remedy. And the right, of course, is to collect in accordance with its tariffs, unless a carrier timely disputes its obligation to pay, not to go back after the fact and seek a do-over. Sprint says, okay, you caught us. We owe the money. But there are no consequences, other than having to pay what they should have paid all along. And 201B expressly allows a private right of action if a carrier, like Sprint, has done something unjust and unreasonable. Does that address the Court's 201B concerns? Thank you, Your Honor. With respect to the District Court's award of unpaid tariffs and late payment charges, we would respectfully submit that the filed rate doctrine alone warrants affirmance of what the District Court did. The District Court judgment awarded CenturyLink $12.9 million for breach of its tariffs, yet nowhere in its appeal briefs does Sprint cite, quote, or even mention the tariffs. Why not? Well, the explanation is obvious. At trial, Sprint conceded that CenturyLink provided the switched access services described in each of the tariffs at issue. That's in the record, and that concession ought to be the beginning and the end of this Court's inquiry. No matter how much Sprint may argue otherwise, its appeal seeks to have this Court lower the rates after the fact in access tariffs that the FCC and each of the state public utility commissions approved. And Sprint, in fact, paid those tariff rates without protest for years. The District Court made a specific finding that the state public utility commissions and the FCC never approved the lower rate, .0007 per minute, that Sprint now wants this Court, or at least wanted the District Court, to set for the benefit of Sprint alone. It's a little unclear whether Sprint still wants that rate set for its benefit, because we've heard this morning that Sprint now says it shouldn't have had to pay permanent access charges at all, in which case, what should it have paid? But in any event, that rate was a local rate. It dealt with Internet service providers, you know, like why am I wrong to look at this sort of simply in the following way, that Sprint has come to the realization that they're an enhanced service provider, that they're actually doing more than just transmitted the message. And in that context, we don't ask, what's your client doing? We ask, are they part of that information service industry that was supposed to get favored treatment to foster it? Well, they're not. And if we look — and so we now know what they were doing was, as of 1996, an enhanced service as opposed to just a transmittal. What's wrong with that? Well, what's wrong with that, Your Honor, is that Sprint's, after the fact, realization that it was an enhanced service provider is inconsistent with the ESP exemption as recognized by the FCC. True. But then they point out that the district courts that looked at this, especially the D.C. district court, came to an opposite conclusion. Well, in both — although Sprint's brief says that several courts reached that conclusion, they really cite only two, the D.C. district court and PAYTAC, and then Eastern District Court. Judge Robinson's decision in PAYTAC. Let's just start with that one. Yes. Well, in that case, Judge Robertson was predicting how the FCC might resolve this issue if called upon to do so. And he predicted that the FCC would, if given the opportunity, find that this was an information service. As the district court in this case found, Judge Robertson guessed wrong. And the FCC — When you say predict and guess, I don't remember Judge Robinson saying, that's what I'm doing. I'm guessing or predicting them. I think he looked at 251G and said this is an information service enhancement. Did he say, this is — without any deference, I'm going to predict what they'll do? The educated guess verbiage, I believe, came out of Judge James' opinion in the Western District of Louisiana. But what Judge Robertson did was he specifically said that the FCC has not — Hasn't ruled. Resolved this issue. And when the FCC hasn't resolved the issue, then the court obviously needs to interpret the issue. But after PAYTEC was decided, the FCC, of course, issued its 2011 Comprehensive Reform Order, the Connect America Fund Order, whatever you want to call it. And there's several aspects of that order that are inconsistent with what Judge Robertson did. And it would — we would submit — make it erroneous for this court to follow his lead. One is that in paragraph 56, the FCC said that those cases were wrongly decided. Now, opposing counsel says that the FCC criticized those cases on different grounds. But more importantly, it seems that the parties vigorously agree that the operative provision of the Comprehensive Reform Order is paragraph 957. And what the FCC said is that regardless of whether particular VoIP services or telecommunications services or information services, there are pre-1996 obligations regarding local exchange carriers' compensation for the provision of exchange access to an IXC. And it's important, Your Honor, one other impediment to the relief that Sprint seeks is that the district court made a finding of fact that in this case, Sprint was acting in its capacity as an IXC, a long-distance carrier, whose obligation to pay access charges was preserved by Section 251G. That's not true of, say, Dow Jones or Lexis or, you know, other enhanced service providers that might have qualified for the ESP exemption. There's several other characteristics of the ESP exemption that are inconsistent with Sprint's position here. One is that typically under the ESP exemption, an information service provider paid a fixed rate to access a telephone line. Again, paragraph 957 of the Comprehensive Reform Order addresses that and talks about the fact that there was a fixed rate, sort of like what a business subscriber would pay to essentially rent or gain access to a telephone line to provide whatever information service it was providing. That's not the case here. And the Supreme Court in Brand X, you know, did address the ESP exemption in the Supreme Court's finding it applicable in that case, but also set forth several criteria from the ESP exemption that make clear why it does not apply and ought not apply in this case. As the Supreme Court noted in that case, an enhanced service is something that allows the public to use a telecommunications facility to access information in a database. We're not talking about a database here. We're talking about subscribers picking up the phone and calling other subscribers. And the best evidence of that is actually in the record at trial, testimony from Sprint's own network engineer who came to Monroe to testify at length. This is in the record at 8204 and 8199 and 8178. He said that the avoid consumer would, and I'm quoting now, just use a traditional analog phone, close quote, to place avoid PSTN call. He also said that a consumer, quote, could switch from a plain old telephone service to avoid phone and not even have to change his phone number. That's the end of the quote. And he also said that from the end consumer's perspective, and that is the perspective that the Supreme Court and Brand X said determined the applicability of the ESP exemption. Again I'm quoting, they pick up a plain old phone, dial a number, and they talk into it same as always. So that's your Roberts. So just a few quick questions so I understand how you would suggest this case has to be decided. You're saying on the one hand it's fact specific, and the district court made no clear error concluding that your client did the exact same switch for either type of call? That the focus is on the consumer and the local administrator, not on the character that Sprint is? Well, we would respectfully submit, Your Honor, the court doesn't even need to get into the facts on that. What about the fact finding that Sprint is an IXC? Is that determinative? That is dispositive, we would submit, because 251G clearly preserved the obligations. And it's interesting the way in which Sprint's argument has morphed, because in the district court the actual law is not defined. I'm going to interrupt you just because of your time. I had two other questions I'd love quick answers on. Was there any district court that did anticipate the FCC's interpretation of 251G? When you say there are just two that went his way, was there any that went your way? We haven't done a comprehensive survey. I happen to know from personal knowledge, having litigated claims against Sprint in the Eastern District of Virginia, affirmed on appeal by the Fourth Circuit, that in that case, where the district court decision was back in 2010 or 2011, the court found that CenturyLink was entitled to collect tariffed rates on VOIP-originated traffic. Procedurally, the case was somewhat different, however, in that the parties had negotiated interconnection agreements, but the interconnection agreements incorporated the tariffs by reference. But it wasn't a disputed point. You didn't bring it to our attention. The last point is you heard his response on the preemption question. How did you interpret that response? Do you sense — do you feel they waived that issue? Definitely, Your Honor. In the district court, one of the principal arguments was that Federal law preempted the State tariffs and also the State statute in Missouri. That argument was not raised in Sprint's opening brief here. And Sprint knows how to raise that, because there's an appeal pending in the Eighth Circuit that was argued on January 11th of this year, briefed in March of last year. And in its brief that Sprint submitted to the Eighth Circuit, and that brief is very similar in many respects to the brief submitted to this Court, Sprint makes the preemption argument eight times, using the word preempt eight times. That's certainly not used in the opening brief here. And even in the response brief and in oral argument, what Sprint seems to be saying is that there's, quote, preemption by virtue of 251G. But that's not really preemption. And, in fact, what the FCC said in its comprehensive reform order is that there is no preemption, that there's a role for State tariffs with respect to compensation for VOIP-originated traffic. So we would respectfully submit that that argument has been waived. And I see I'm out of time, so unless the Court has any other questions, I'll sit down. Thank you, counsel. You're welcome. Rebuttal. Very briefly, Your Honor. First, where the Court ended with preemption, I want to clarify again there are two preemption arguments. One was the argument that we're not making, an argument that Federal tariffs apply here. And then there's the preemption argument that we did make, which is that Federal law controls this whole area of what companies pay to local phone companies for doing this. The AT&T v. IUB case... The cases may exist, but field preemption is nowhere in your brief. It's not. We're not claiming field preemption. We're claiming conflict preemption. That is in our brief. You know, in our statement of jurisdiction, we point out that the Supremacy Clause case... That embraces a conflict preemption argument? Yes. Yes. We're saying that... We should have just perceived that behind the reference to the Supremacy Clause. We may have been — I apologize if we were less... Go on with your other points. But that is our argument, that the Federal statute controls all of this law here, and the State statutes are conflicted by that. Your argument that all of your calls are Info Services calls? Yes. Yes. That's a point you made in your opening argument here. Yes. Yeah. Quickly, on the question of what the FCC has said, again, we want the Court to defer to what the FCC has said. And the key language is in paragraph 957, again, of the Connect America Fund Order. There, the FCC says, similar to the extent that inter-exchange void services were transmitted directly from an Information Services provider, such traffic is subject to the pre-1996 obligations regarding exchange access, though the access charge imposed on Information Services is paid by IXCs. But if that's dispositive and the district court found that Sprint was an IXC, not an ISP, you have to establish that that's a finding that's clear error. I don't think the Court actually found that Sprint is an IXC. Sprint — well, let me say this. Sprint is an IXC, of course, in some contexts. It sends normal phone calls all the time. The district court heard two days of trial and made the conclusion this is an IXC. I mean, or do you say he has no record support for that statement? I don't think that the Court found that with respect to sending these phone calls, that Sprint is an IXC. With respect to these phone calls, it's an Information Services provider because they're Information Services. The district court made that finding? It didn't find one way or the other about that. Okay. But, finally — All right. Okay. Thank you. Thank you. All right. The Court takes this matter under review.